**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WITCHITA FALLS DIVISION**

| | |
|---|---|
| VM INNOVATIONS I, LLC,<br><br>                    Plaintiff,<br>          v.<br><br>COINBASE GLOBAL, INC.,<br><br>                    Defendant. | Case No.  7:26-cv-51<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT FOR PATENT INFRINGEMENT
AGAINST COINBASE GLOBAL INC.**

This is an action for patent infringement arising under the Patent Laws of the United States of America, 35 U.S.C. § 1 *et seq.*, in which Plaintiff VM Innovations I, LLC ("Plaintiff" or "VM I") makes the following allegations against Defendant Coinbase Global, Inc. ("Coinbase" or "Defendant"):

**INTRODUCTION**

1.      This complaint arises from Coinbase's unlawful infringement of the following United States patents concerning improvements to blockchain network architecture:  United States Patent Nos. 10,853,772 ("the '772 Patent"), 12,051,067 ("the '067 Patent"), 10,394,845 ("the '845 Patent"), 10,102,265 ("the '265 Patent"), 11,861,609 ("the '609 Patent"), 11,915,237 ("the '237 Patent"), and 11,494,764 ("the '764 Patent") (collectively, the "Asserted Patents").

**PARTIES**

2.      Plaintiff VM Innovations I, LLC is a Delaware limited liability company, with its principal place of business at 7600 Chevy Chase Dr Suite No. 300, Austin, TX 78752.  VM I is the sole owner by assignment of all rights, title, and interests in the Asserted Patents, including the

1

right to recover for past, present, and future infringement.

3.    Defendant Coinbase Global, Inc. is a Texas corporation, organized under the laws of the state of Texas.   Coinbase is registered to conduct business in the state of Texas and has a registered office in this District located at 1999 Bryan St. #900, Dallas, Texas 75201.  Coinbase purports to have no principal place of business and is a "remote-first company." *SEC v. Coinbase, Inc., et al.*, No. 23-cv-04738-KPF, Dkt. No. 22 at 39 ¶ 16 (S.D.N.Y. June 28, 2023); *see also* Ex. 1 (https://investor.coinbase.com/resources/investor-faqs/default.aspx).

4.    Coinbase is a holding company for Coinbase, Inc. and other subsidiaries which, together, collectively operate as a publicly traded cryptocurrency exchange and financial platform that provides products and services that allow individuals and institutions to buy, sell, store, and manage digital assets, like Bitcoin and Ethereum.  Coinbase does business in the State of Texas and in the Northern District of Texas, directly or through intermediaries, such as its wholly-owned subsidiaries.  Coinbase is responsible for importing, making, marketing, distributing, offering for sale, and/or selling Coinbase products and services in Texas (directly or through its wholly-owned subsidiaries), including in this District.

5.    Coinbase induces its subsidiaries, affiliates, retail partners, and customers in the making, using, selling, offering for sale, and/or importing throughout Texas, including within this District, infringing products and services (such as through the Coinbase Platform, Exchange Wallet, and/or Base applications) and placing such products and services into the stream of commerce via established distribution channels knowing or understanding that such products and services will be sold and used in the State of Texas, including in the Northern District of Texas.  Coinbase purposefully directs the Accused Products into established distribution channels within the State of Texas.  For example, Coinbase was issued "Texas – DOB Money Transmitter License, 3121"

2

by the Texas Department of Banking, which allows Texas residents to buy, sell, and trade crypto-currencies.  Ex. 2 (https://www.coinbase.com/legal/licenses).  Coinbase sells and offers to sell the accused products and services through its website, www.coinbase.com, which may be accessed throughout the State of Texas and this District.  Ex. 3 (Coinbase 2025 10-K) at 20 (identifying www.coinbase.com as its website).  In addition, Coinbase does not distinguish between itself and subsidiaries in marketing and offering its products and services through its website www.coinbase.com.  Coinbase receives revenue from sales and distribution via electronic transactions conducted on and using at least the accused products and services, and incorporated and/or related systems, from users in Texas.  Ex. 3 (Coinbase 2025 10-K) at 116-20.

6.    Coinbase and its wholly-owned subsidiaries operate as agents of one another and vicariously as parts of the same business group to work in concert together.  For example, Coinbase does not generally distinguish between itself and its wholly-owned subsidiaries, including by referring to Coinbase and its subsidiaries collectively as "Coinbase" or the "the Company" in its disclosures to the U.S. Securities and Exchange Commission:

**Corporate Information**

We were initially incorporated in May 2012 as Coinbase, Inc., a Delaware corporation. In January 2014, Coinbase Global, Inc. was incorporated as a Delaware corporation to act as the holding company of Coinbase, Inc. and our other subsidiaries. In April 2014, we completed a corporate reorganization whereby Coinbase, Inc. became a wholly-owned subsidiary of Coinbase Global, Inc. In December 2025, Coinbase Global, Inc. converted to a Texas corporation. Coinbase Global, Inc.'s principal assets are its interests in the equity of Coinbase, Inc. In addition to Coinbase, Inc., Coinbase Global, Inc. is the parent company of a number of other operating subsidiaries. We are a remote-first company, meaning the majority of our employees work remotely. Due to this, we do not maintain a headquarters.

Coinbase, the Coinbase logo, and other registered or common law trade names, trademarks, or service marks of Coinbase included in this Annual Report on Form 10-K are the property of Coinbase. Other trademarks, service marks, or trade names included in this Annual Report on Form 10-K are the property of their respective owners.

Ex. 3 (Coinbase 2025 10-K) at 20.

**ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

The following discussion and analysis of our financial condition and results of operations should be read in conjunction with our Consolidated Financial Statements and the accompanying notes thereto included elsewhere in this Annual Report on Form 10-K. The following discussion and analysis contains forward-looking statements that involve risks and uncertainties, as well as assumptions that, if they never materialize or prove incorrect, could cause our results to differ materially from those expressed or implied by such forward-looking statements. Factors that could cause or contribute to these differences include, but are not limited to, those identified below and those discussed in the section titled Risk Factors in Part I, Item 1A of this Annual Report on Form 10-K. Unless otherwise expressly stated or the context otherwise requires, references to "we," "our," "us," "the Company," and "Coinbase" refer to Coinbase Global, Inc. and its consolidated subsidiaries. For all narrative provided in this Item 7, two numbers presented consecutively represent figures for the year ended December 31, 2025 as compared to the year ended December 31, 2024, respectively, unless otherwise noted. Management's Discussion and Analysis of Financial Condition and Results of Operations for the year ended December 31, 2024 as compared to the year ended December 31, 2023 can be found in Item 7 of our Annual Report on Form 10-K for the year ended December 31, 2024, as filed with the Securities and Exchange Commission on February 13, 2025, which is incorporated by reference herein.

*Id.* at 89.

3

**1. NATURE OF OPERATIONS**

Coinbase, Inc. was founded in 2012. In April 2014, in connection with a corporate reorganization, Coinbase, Inc. became a wholly-owned subsidiary of Coinbase Global, Inc. (together with its consolidated subsidiaries, the "Company"). On December 15, 2025, the Company effected a reincorporation from the State of Delaware to the State of Texas (the "Reincorporation").

The Company provides a trusted platform that serves as a compliant on-ramp to the onchain economy and enables users to engage in a wide variety of activities with their crypto assets in both proprietary and third-party product experiences enabled by access to decentralized applications. The Company offers (i) consumers their primary financial account for the onchain economy, (ii) institutions a full-service prime brokerage platform with access to deep pools of liquidity across the crypto marketplace, and (iii) developers a suite of products granting access to build onchain.

*Id.* at 121. These public statements refer to "a trusted platform" provided by "the Company," "the Company's offices," and to various technology that "the Company offers." In addition, Coinbase's "Consolidated Financial Statements" reflect revenues and other financial metrics collectively for the "Company." *See id.* at 89-105.

7.    Coinbase's interrelated relationship with its subsidiaries is further evidenced by the fact it shares management-level employees with its wholly-owned subsidiaries. *See* Ex. 4 (*SEC v. Coinbase, Inc., et al.*, No. 23-cv-04738-KPF, Dkt. No. 22 at 39 ¶ 16 (S.D.N.Y. June 28, 2023)) at ¶ 71 ("Coinbase admits that some of the Company's executive officers hold the same executive positions with respect to Coinbase, Inc. and Coinbase Global, Inc."). For example, Coinbase Global, Inc.'s Chief Financial Officer, Alesia Haas, is also the Chief Executive Officer and a Director at Coinbase, Inc. In addition, Coinbase Global, Inc.'s Legal Officer and Corporate Secretary, Paul Grewal, is also the Secretary and a Director at Coinbase, Inc.:



Ex. 5 (https://investor.coinbase.com/governance/management/default.aspx).

| Last Update | Name | Title | Address |
|---|---|---|---|
| October 11, 2024 | ALESIA HAAS | CHIEF EXECUTIVE OFFICER/CHIEF FI | 248 3RD ST #434 OAKLAND, CA 94607 USA |
| October 11, 2024 | ALESIA HAAS | DIRECTOR | 248 3RD ST #434 OAKLAND, CA 94607 USA |
| October 11, 2024 | PAUL GREWAL | DIRECTOR/SECRETARY | 248 3RD ST #434 OAKLAND, CA 94607 USA |
| October 11, 2024 | PAUL GREWAL | DIRECTOR | 248 3RD ST #434 OAKLAND, CA 94607 USA |
| October 11, 2024 | MELISSA STRAIT | CHIEF COMPLIANCE OFFICER | 248 3RD ST #434 OAKLAND, CA 94607 USA |
| October 11, 2024 | CORY HOWARD | BANK SECRECY ACT AND ANTI-MONEY | 248 3RD ST #434 OAKLAND, CA 94607 USA |

Ex. 6 (Texas Secretary of State – Coinbase, Inc. profile).

8.      Coinbase has also targeted Texas-based companies for acquisition and, conse-quently, expansion of its business activities in the State of Texas.  For example, in 2021, Coinbase acquired Austin-based Unit 410 LLC ("Unit 410"), which specialized in institutional self-custody wallets and staking.  Ex. 5  (https://investor.coinbase.com/governance/management/) ("Coinbase acquired Unit 410 in 2021.").  The CEO of Unit 410, Rob Witoff, is now part of Coinbase's exec-utive team.  Ex. 7 (https://www.coinbase.com/blog/Welcome-Rob-Witoff-to-the-Coinbase-Exec-

Team).

9.      Coinbase has also directed other business activities to the State of Texas. For example, on information and belief, Coinbase is a founding member of the Crypto Freedom Alliance of Texas. Ex. 8 (https://cryptoalliancetx.org/press-releases/blog-post-title-one-mn4lk). Coinbase has also participated in industry presentations and conferences in Texas. Ex. 9 (https://investor.coinbase.com/news/news-details/2024/Coinbase-to-Participate-in-the-Morgan-Stanley-US-Financials-Payments-and-CRE-Conference/default.aspx).

10.     Coinbase, alone and through its subsidiaries (such as Coinbase Inc.), places such infringing products and services into the stream of commerce via established distribution channels knowing or understanding that such products would be sold and used in the State of Texas, including in the Northern District of Texas. Coinbase has derived substantial revenue from infringing acts in the State of Texas and this District, including from the sale and use of infringing products and services. *See* Ex. 3 (Coinbase 2025 10-K) at 116-20.

## JURISDICTION AND VENUE

11.     This action arises under the patent laws of the United States, Title 35 of the United States Code. This Court has original subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a).

12.     The Court has personal jurisdiction over Coinbase in this action because Coinbase has committed acts within this District giving rise to this action and has established minimum contacts with this forum such that the exercise of jurisdiction over Coinbase would not offend traditional notions of fair play and substantial justice. Coinbase, directly and through subsidiaries or intermediaries, has committed and continues to commit acts of infringement in this District by, among other things, making, using, importing, offering to sell, and/or selling products and services

that infringe the Asserted Patents.  Coinbase is registered and licensed to conduct business in the State of Texas, and offers Texas residents products and services through www.coinbase.com.  Ex. 6 (Texas Secretary of State Profile); Ex. 2 (https://www.coinbase.com/legal/licenses).  In addition, a substantial number of Coinbase employees live and work in the State of Texas.  For example, members of the Coinbase management and other management-level employees live and work in Austin, Texas.  Ex. 10 (https://www.coinbase.com/about); Ex. 11 (https://www.linkedin.com/in/rwitoff/); Ex. 12 (https://www.linkedin.com/in/gdgarrison/); Ex. 13 (https://www.linkedin.com/in/scott-w-bauguess/).  Coinbase has also directed other business activities to the State of Texas.  For example, on information and belief, Coinbase is a founding member of the Crypto Freedom Alliance of Texas.  Ex. 8 (https://cryptoalliancetx.org/press-releases/blog-post-title-one-mn4lk).   Coinbase has also participated in industry presentations and conferences in Texas.  Ex. 9 (https://investor.coinbase.com/news/news-details/2024/Coinbase-to-Participate-in-the-Morgan-Stanley-US-Financials-Payments-and-CRE-Conference/default.aspx).

13.      Venue is proper in this District under 28 U.S.C. §§ 1391 and 1400(b).  Coinbase is incorporated in the state of Texas.  Coinbase purports to have no principal place of business and is a "remote-first company."  *SEC v. Coinbase, Inc., et al.*, No. 23-cv-04738-KPF, Dkt. No. 22 at 39 ¶ 16 (S.D.N.Y. June 28, 2023); *see also* Ex. 1 (https://investor.coinbase.com/resources/investor-faqs/default.aspx).  Coinbase is registered to conduct business in the state of Texas and has a registered office in this District located at 1999 Bryan St. #900, Dallas, Texas 75201. In addition, on information and belief, Coinbase has transacted business in this District and has committed acts of direct infringement in this District by, among other things, making, using, offering to sell, selling, and importing products and providing services that infringe the Asserted Patents.  For example, Coinbase is registered and licensed to conduct business in the State of Texas.  Ex. 6 (Texas

Secretary of State Profile); Ex. 2 (https://www.coinbase.com/legal/licenses).

## OVERVIEW OF ASSERTED PATENTS

14.     The Asserted Patents are directed to specific technological solutions to technological problems faced by decentralized blockchain networks.  The Asserted Patents are directed to improvements to blockchain network architecture that enable blockchain interoperability among heterogeneous blockchain networks, improve blockchain network scalability using hybrid blockchain networks, utilize a novel transaction aggregation mechanism employing tethered tokens, and increase blockchain network security to prevent fraudulent transactions through real-time transaction filtering and multi-layered smart contracts.

15.     The inventions claimed by the Asserted Patents address technological problems and provide technological solutions to issues specific to blockchain networks that were not well-understood, routine, or conventional at the time of the inventions.  The disclosures and claims are drawn to solving specific, technical problems in blockchain networks, as a person of ordinary skill in the art reading the Asserted Patents and their claims would understand.  Moreover, a person of ordinary skill in the art would understand that the claimed subject matter represents advancement in the technical fields of the Asserted Patents and provide improvements over the prior art and inventive concepts.  The claims do not preempt all techniques for or approaches to accomplishing the same or a similar end to what they recite, for example, including the prior art.  The patent examiners found that none of the prior art cited by the Asserted Patents discloses or render obvious the claimed inventions, which shows that the claims were not well-understood, routine, or conventional at the time of the inventions.

### A.     The '772 and '067 Patents

16.     The   claimed   inventions   of   the   '772   and   '067   Patents   are   directed   to   a

communications architecture that facilitates interoperability across different blockchain networks. Specifically, the claims are directed to an architecture for integrating and executing cross-chain value conversions across heterogeneous distributed blockchain networks using client-side key signing, server-side transaction generation, and simultaneous connection and coordination among the different blockchain networks.

17. The '772 and '067 Patents provide specific technical solutions to a fundamental technical problem in decentralized blockchains: the inability to directly communicate and convert cryptocurrencies and tokens across different heterogeneous blockchain networks. For example, prior to the inventions claimed by the '772 and '067 Patents, blockchain networks operated as isolated silos and lacked interoperability protocols comparable to TCP/IP for internet communication—in other words, there was no standardized architecture for cross-chain conversions. Relatedly, there was a need to maintain cryptographic security while coordinating multi-network transactions, preventing exposure of private keys during cross-network transfers, and synchronizing atomic transactions across heterogeneous blockchain platforms. The '772 and '067 Patents claim inventions that provide technical solutions to these problems by claiming a specific network communication architecture for enabling value conversions between different blockchain networks. Specifically, the claimed inventions enable swapping different tokens and cryptocurrencies across blockchain networks, while also maintaining security through client-side signing and multi-signature verification.

18. The '772 and '067 Patents claim a cross-chain architecture that improves the functionality of distributed blockchain network systems by, for example:

- **Enabling previously impossible inter-network communication and conversion:** The patented technology of the '772 and '067 Patents fills a previously unmet

need in heterogeneous distributed blockchain networks.  Before the claimed inventions, there was no mechanism for direct value conversions between different blockchain networks.

- **Providing a standardized communication architecture:** Similar to TCP/IP for internet communications, the '772 and '067 Patents provide a communications architecture for conversions across different blockchain networks.

- **Solving the private key security problem:** Client-side signing prevents private key exposure during cross-network coordination.

- **Creating atomic cross-chain transactions:** The use of a coordinated cross-chain architecture for value conversion ensures transaction integrity across networks.

19.     While some prior solutions sought to address the unsolved need for coordinated cross-chain conversions, those attempted solutions operated differently or were otherwise technologically inferior to the claimed inventions.  For example, manual conversions were impractical.  Among other things, manual conversions required independent action on separate blockchain networks, with an intermediary—e.g., a bank moving funds between separate accounts linked to the different blockchain network—required to complete any conversion.  Manual transfers were, therefore, time-consuming, inefficient, and introduced multiple points of failure.

20.      In addition, automated, non-custodial intermediaries like "ShapeShift" offered only partial improvements because they lacked the direct blockchain-to-blockchain coordination required for true interoperability.  A prior service called "ShapeShift" operated as an intermediary between users and cryptocurrency exchanges and did not provide an architecture that allowed blockchain networks to directly coordinate cross-chain value conversions.  *See, e.g.*, Ex. 14 (U.S. Dep't of the Treasury, OFAC Enforcement Release – ShapeShift AG Settlement (Sept. 22, 2025)

10

(describing ShapeShift "on-chain" transfers where ShafeShift operated as "the sole counterparty"); Ex. 15 (SEC Admin. Proceeding File No. 3-21891, Order Instituting Cease-and-Desist Proceedings Against ShapeShift AG (Mar. 5, 2024)) (explaining "ShapeShift did not arrange exchanges between customers, but instead effected exchanges from its own inventory, serving as the customer's counterparty in every transaction"); Ex. 16 (CoinDesk, "Crypto Exchange ShapeShift Calls Money Laundering Claims 'Deceptive'" (Oct. 1, 2018)) ("Unlike most other exchanges, ShapeShift is a crypto-to-crypto, non-custodial platform. We don't take custody of user funds, but instead swap our own assets for theirs, at a set price."); Ex. 17 (Underscore VC Blog, "The Perils of Custodial Trading and the Promise of Non-Custodial Trading" (2018)) (describing vulnerabilities in ShapeShift's sequential transfer model, where users' assets were "at risk in the middle of a trade").  In addition, ShapeShift did not implement the client-side signing or atomic cross-chain transactions claimed by the '772 and '067 Patents, which enable secure, standardized value conversions across networks without the need for intermediaries.  The patent examiner also expressly distinguished the claimed inventions from ShapeShift (and other prior art) in allowing the claims of the '772 and '067 Patents.

21.    The '772 and '067 Patent claims also contain an inventive concept through an unconventional order and/or combination of technical elements including client-side signing, server and dual-blockchain network coordination, vault account mechanisms, and/or multi-layer security protocols.  While traditional communications systems seek to connect to a single blockchain network, the '772 and '067 Patents teach simultaneous connection and coordination between multiple, heterogenous blockchain networks by using a specific technological architecture.

22.    The '772 and '067 Patent claims include limitations on their scope through, for example:

- **Network Architecture:** The communications occur through a network communication device and/or application programming interface ("API"). The claimed architecture includes support for both intra-chain and inter-chain determinations and the ability to maintain connections to multiple blockchain networks simultaneously.

- **Cryptographic Keys:** The architecture supports client-side private key signing and server-side signature verification.

- **Conversion Flow:** The claims teach a specific conversion flow for inter-chain conversions.

23.    In light of these limitations, the '772 and '067 Patent claims do not preempt all methods of converting value across distributed heterogeneous blockchain networks. Rather, the claims are limited to the specific process flows recited in the claims, meaning that alternative approaches remain available to others.

### B.    The '265 and '845 Patents

24.    The claimed inventions of the '265 and '845 Patents are directed to a multi-tier blockchain network architecture with synchronized smart contracts and cryptographic checkpointing that enables blockchain network scalability. Specifically, the '265 and '845 Patents claim an architecture whereby multiple private blockchain blocks on a private blockchain network are combined (i.e., "merged") into a single blockchain block on a second blockchain network and the conversions between the private and second blockchain network are synchronized without centralized coordination.

25.    The '265 and '845 Patents address several technical problems that existed in blockchain networks at the time:

- **Scalability Constraints:** Public blockchain networks (Bitcoin, Ethereum) suffered

12

from severe value conversion throughput limitations (3-7 tx/sec for Bitcoin, 7-15 tx/sec for Ethereum).

- **Conversion Latency:** Block confirmation times ranged from 10+ minutes (Bitcoin) to 17+ seconds (Ethereum), making real-time applications impractical.

- **Decentralization-Scalability-Security "Trilemma":** It is well documented that blockchain networks cannot simultaneously achieve high decentralization, scalability, and security—referred to as the "trilemma." Ex. 18 (https://www.coinbase.com/learn/crypto-glossary/what-is-the-blockchain-trilemma).  That is, blockchain networks operate with fundamental architectural constraints, where improvements in one dimension (e.g., scalability) necessarily degraded others (security, decentralization).

- **Network Architecture Limitations:** Existing blockchain designs lacked mechanisms for hierarchical blockchain network processing or efficient synchronization between different blockchain networks.

26.    The '265 and '845 Patents provide technological solutions to these problems in decentralized blockchain networks, including:

- **Hybrid Architecture:** The '265 and '845 Patent claims allow for synchronization of private/permissioned blockchain networks (which provide faster, low-cost processing) with other blockchain networks (such as public blockchains, which provide increased security, but slower processing).

- **Merged Blocks:** Multiple transactions on private blockchain networks are cryptographically combined into single merged blocks associated with other blockchain networks (such as public chains).  Simulations demonstrate a 94% reduction in the

number of transactions required when syncing token smart contract states between private and public blockchain networks according to the claimed inventions.

- **Synchronization and Checkpointing Protocols:** The claims utilize novel checkpointing mechanisms that maintain consistency among smart contracts across heterogenous blockchain networks with replicated data, different consensus mechanisms, block times, and security parameters.

27. The claimed inventions of the '265 and '845 Patents provide tangible, measurable improvements to the operation of blockchain networks:

- **Increased Conversion Throughput:** The claimed inventions enable a multi-order magnitude improvement to value conversion throughput by using through parallel processing on private chains.

- **Reduced Conversion Latency:** Conversion latency is reduced from minutes to milliseconds for private blockchain network transactions.

- **Efficiency Enhancements:** A 94% reduction in the number of value conversions required for synchronizing smart contract states on private and public blockchain networks (documented in simulation, Appendix A).

- **Improved Network Resource Requirements:** The claimed architecture reduces bandwidth, processing, storage requirements for high-frequency conversions.

- **System Reliability:** Checkpointing and synchronization mechanisms ensure reliability among and across blockchain networks.

- **New Capabilities:** Allows for new IoT applications by enabling increased throughput for handling a large number of devices.

28. The '265 and '845 Patents differ from other prior off-chain solutions, such as the

14

"Lightning Network" and "Raiden Network." Those prior solutions leveraged bidirectional payment channels. Ex. 19 (Lightning Network Whitepaper); Ex. 20 (Raiden Network FAQ) (https://raiden.network/faq.html). However, the '265 and '845 Patents explain that "[a] limitation of payment channels is that the participants need to lock up tokens in a payment channel contract upfront." '265 Patent at 5:10-12; '845 Patent at 5:22-24. For example, the Lightning Network requires participants to fund channels via an upfront funding transaction that locks bitcoins in a shared 2-of-2 multisignature output until closure. Ex. 19 (Lightning Network Whitepaper) at 2-3. Similarly, the Raiden Network mandates locking tokens upfront for each potential payee to establish bidirectional netting channels, limiting scalability for broad networks. Ex. 20 (Raiden Network FAQ) (explaining the Raiden Network "it is not suitable for many-to-many payment setups as it requires users to lock up tokens upfront for every potential payee."). The claimed inventions, on the other hand, do not require that user funds be locked upfront, which enables greater flexibility for users. '265 Patent at 5:13-19; '845 Patent at 5:25-31.

29. The '265 and '845 Patent claims also contain an inventive concept through an unconventional order and/or combination of technical elements including receiving and recording value conversions on private blockchain networks, generating merged blocks combining multiple private blocks, recording the merged blocks on a different blockchain network (such as a public blockchain), and mirroring, synchronizing, and/or checkpointing smart contracts, among other features. The claimed elements form a multi-tier blockchain network architecture that was not well-understood, routine, or conventional at the time of the inventions.

30. The '265 and '845 Patent claims also include limitations on their scope through, for example:

- **Specific network architecture and data structures:** The claims recite the use of

private and second blockchain networks (e.g., public blockchains) with defined relationships and that utilize specific data structures, such as merged blocks, smart contracts, and checkpointed states.

- **Specified processes:**  The claims recite block generation in a specific order and the use of certain processes (such as synchronization and checkpointing).

31.    In light of these limitations, the '265 and '845 Patent claims do not preempt all methods using private blockchain networks.  Rather, the claims are limited to the specific architecture and process flows recited in the claims, meaning that alternative approaches remain available to others.

C.    **The '609 Patent**

32.    The '609 Patent claims are directed to a blockchain network architecture that aggregates multiple value conversions, calculates net amounts, distributes processing responsibilities among servers utilizing load balancing, uses intermediary tether tokens for cross-chain conversions, and executes only the net conversions across heterogenous blockchains.

33.    The '609 Patent addresses several technical limitations in blockchain networks at the time:

- **Deferred Recordings:**  Traditional approaches required each transaction to be immediately recorded to a blockchain, which can be expensive.  Blockchain networks are also unconcerned with aggregation, meaning users may defer recoding a transaction until a later time when net transaction values are more ascertainable.  However, users that defer recording transactions on blockchain are more vulnerable to fraud.

- **Cross-Chain Conversion Inefficiencies:**  Blockchain networks operate as isolated

systems with incompatible protocols. Previously, there were no mechanisms for efficient and secure aggregated value conversions between different blockchain networks.

- **Scalability Limitations:** Blockchain networks are hindered by network congestion when handling high transaction volumes. Individual transaction processing also creates computational bottlenecks.

34. The '609 Patent provides technological solutions to these problems in decentralized blockchain networks, including:

- **Aggregation Mechanism:** The '609 Patent teaches executing only net transaction amounts on a blockchain network upon reaching aggregation thresholds. Utilizing the net transaction techniques of the '609 Patent reduces the number of actual blockchain value conversions by orders of magnitude.

- **Cross-Chain Conversion Architecture:** The '609 Patent claims utilize "tether tokens" as intermediary exchange mechanisms and implement specific conversion and recording protocols for cross-network conversions. The '609 Patent architecture enables aggregated value conversions between otherwise incompatible blockchain networks.

- **Distributed Server Scheme:** The '609 Patent teaches the use of an API gateway for request logging and authentication, load balancing for distributing transactions across multiple servers, and multi-signature transaction signing for enhanced security, all of which reduce computational load on any particular server.

35. The inventions claimed by the '609 Patent result in tangible, measurable improvements in blockchain networks, including:

- **Larger Scalability:** Blockchain transaction processing requires distributed consensus across thousands of nodes.  Consequently, Bitcoin can only achieve approximately 7 transaction per second, while Ethereum can only achieve approximately 15 transactions per second.  This contrasts with traditional payment methods, such as Visa, which can process approximately 24,000 transactions per second.  Through the claimed architecture, 100 blockchain transactions are aggregated into 10 net transactions, for example, and results in a 90% reduction in blockchain load.

- **Improved Network Throughput:** The '609 Patent enables a substantial throughput improvement without changing blockchain protocol (e.g., aggregating 100 transactions into 10 net transactions) and allows for microtransactions by aggregating many transactions into larger net transactions.

- **Cross-Chain Compatibility:** Blockchain networks are decentralized, and use their own unique data structures and consensus mechanisms.  For example, there is no native interoperability between Bitcoin and Ethereum, requiring users to utilize centralized cryptocurrency exchanges and thereby defeating the purpose of decentralized networks.  The '609 Patent enables cross-chain conversion through intermediate tether tokens, which are used for recording transactions on multiple blockchains.

36.    The '609 Patent differs from other prior solutions, such as the "Lightning Network," which proved inadequate.  For example, the "Lightening Network" is a layer-2 solution built on top of the Bitcoin blockchain.  Ex. 19 (Lightning Network Whitepaper).  However, the Lightening Network is a solution limited to Bitcoin and does not address the need for aggregated transactions for cross-chain conversions (*id.* at 3)—problems that are addressed by the '609 Patent

claims.

37.    The '609 Patent claims also contain an inventive concept through an unconventional order and/or combination of technical elements including the use of an aggregation mechanism that nets transactions before they are executed, a specific tether token exchange architecture for cross-chain value conversions, and multi-signature authentication integration, among other features.  The claimed elements form a blockchain architecture for aggregating cross-chain conversions that was not well-understood, routine, or conventional at the time of the inventions.

38.    The '609 Patent claims also include limitations on their scope through, for example:

- **Specific architecture:**  The '609 Patent claims recite API gateways and load balancers, and are limited to the specific claimed architecture.

- **Net calculation before blockchain execution:**  The '609 Patent ensures aggregate transactions are calculated before they are executed on a blockchain network minimizes the number of on-chain operations.

- **Specific mechanism for cross-chain conversions:**  The '609 Patent enables cross-chain value conversions through the use of tether tokens.

39.    In light of these limitations, the '609 Patent claims do not preempt all methods executing net value conversions on blockchain networks.  Rather, the claims are limited to the specific process flows recited in the claims, meaning that alternative approaches remain available to others.

**D.    The '764 and '237 Patents**

40.    The claimed inventions of the '764 and '237 Patents are directed to an improved blockchain security architecture that utilizes transaction filtering and multiple smart contracts for preventing fraudulent transactions.

41.    The '764 and '237 Patents address several technical problems that existed in blockchain networks at the time:

- **Decentralized Security:**  Traditional blockchain networks are decentralized and do not contain any centralized security systems.

- **Security Vulnerabilities and Fraudulent Transactions:**  In blockchain networks, hackers exploit security weaknesses in smart contracts to steal user funds.  Compromised cryptocurrency wallets are also used to engage in fraudulent transactions.

- **Lack Of Real-Time Filtering Mechanisms:** Prior solutions relied on post-transaction analysis to detect unauthorized transactions.  Blockchain networks lack the ability to filter transactions to detect and prevent suspicious transactions prior to recording transactions on a blockchain.

42.    The '764 and '237 Patents provide technological solutions to these problems in decentralized blockchain networks, including:

- **Separate Filter Smart Contract Execution:**  The '764 and '237 Patents teach the use of separable filter smart contracts that operate independently from primary smart contracts that govern transaction mechanics.  The filter smart contracts are used to implement security responses and also inform the system to provide an updated filter smart contract for a subsequent transaction.

- **Use Of Hybrid Architecture:**  The claims recite integrating blockchain smart contracts with functionality outside of blockchain networks, such as machine-learning systems and databases for identifying fraudulent transaction patterns.  These "off-chain" mechanisms coordinate with blockchains to improve the security of a particular blockchain network.

- **Immediate Threat Response:** The '764 and '237 Patents teach implementing security responses that actively intervene in blockchain transactions that are identified by the system prior to recording the transaction on a blockchain network.

43.    In light of these technological improvements, the '764 and '237 Patents differ from prior methods for transaction processing on blockchain networks.  For example, conventional blockchain processing executes a single smart contract each transaction.  However, once a smart contract is deployed, it cannot be modified.  This creates an immutability problem—the immutable nature of smart contracts is beneficial by preventing unauthorized tampering with a deployed smart contract, but simultaneously prevents security updates to deployed smart contracts.  Ex. 21 (Blockchain technology through a paradox lens: Bridging the gap between promise and reality?) (describing immutability "paradox").  Traditional blockchain networks also utilized static security rules and lacked dynamic filtering updates. The '764 and '237 Patents address these problems by teaching the use of separable filter contracts that enable real time security filtering and updates without modifying the business logic encompassed in a smart contract.  The '764 and '237 Patents also teach the use of integrated machine learning for improved transaction pattern recognition.

44.    The '764 and '237 Patent claims also contain an inventive concept through an unconventional order and/or combination of technical elements including a novel filter smart contract architecture, deploying separate filter smart contracts, integrating machine learning for updating filter smart contracts, and filtering and responding to real-time blockchain transactions, among others.  The claimed elements form a blockchain architecture that improves blockchain security that was not well-understood, routine, or conventional at the time of the inventions.

45.    The '764 and '237 Patent claims also include limitations on their scope through, for example:

- **Specific dual smart contract architecture:**  The '764 and '237 Patents utilize separate filter smart contracts for detecting fraudulent transactions in a blockchain network.

- **Limited application of machine-learning:** Mahine-learning is only utilized in the context of updating a transaction pattern learning system for updating filter smart contracts.

46.    In light of these limitations, the '764 and '237 Patent claims do not preempt all methods using private blockchain networks.  Rather, the claims are limited to the specific process flows recited in the claims, meaning that alternative approaches remain available to others.

## COUNT I

## INFRINGEMENT OF U.S. PATENT NO. 10,853,772

47.    Plaintiff realleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

48.    Plaintiff owns by assignment all rights, title, and interest, including the right to recover damages for past, present, and future infringement, in U.S. Patent No. 10,853,772, titled "Method and system for exchange of value or tokens between blockchain networks."  The '772 Patent was duly and legally issued by the United States Patent and Trademark Office on December 1, 2020.  A true and correct copy of the '772 Patent is attached as Exhibit 22.

49.    On information and belief, Coinbase has and continues to make, use, offer for sale, sell, and/or import certain products and services utilizing the Cross-Chain Transfer Protocol (CCTP), including without limitation Coinbase Wallet and Base applications ("Accused Products"), that directly infringe, literally and/or under the doctrine of equivalents, one or more claims

of the '772 Patent.  Identification of the Accused Products will be provided in Plaintiff's infringement contentions disclosed pursuant to the Court's scheduling order.

50.    The Accused Products satisfy all claim limitations of one or more claims of the '772 Patent.  A claim chart comparing exemplary independent claim 1 of the '772 Patent to representative Accused Products is attached as Exhibit 23.  Upon information and belief, Coinbase performs the steps of the method on its own servers and/or on virtual private cloud servers provided by third parties.  Through the software code that Coinbase runs on its own or third-party servers, Coinbase conditions participation in, and receipt of the benefits of, the Coinbase services upon performance of the steps of claim 1 of the '772 Patent and establishes the manner and timing of that performance.

51.    Coinbase obtained knowledge of the '772 Patent since at least December 22, 2022 through the Patent Office's Non-Final Rejection identifying the application that issued as the '772 Patent as prior art to U.S. Patent App. No. 17/350,539, which issued to Coinbase as U.S. Patent No. 12,093,999 on September 17, 2024.

52.    Coinbase knowingly and intentionally induces infringement of one or more claims of the '772 Patent in violation of 35 U.S.C. § 271(b).  At least as of the filing and service of this complaint, Coinbase obtained knowledge of the '772 Patent and the infringing nature of the Accused Products.  Despite this knowledge of the '772 Patent, Coinbase continues to actively encourage and instruct its customers and end users (for example, through online instruction and other online publications cited in Exhibit 23) to use the Accused Products in ways that directly infringe the '772 Patent.  For example, Coinbase advertises that the Accused Products support the transfer of USD Coin (USDC) stablecoin to different blockchains.  Ex. 24 (https://help.coinbase.com/en/wallet/managing-account/usdc-coinbase-wallet).    Coinbase    also    instructs    its

customers and end users on how to configure and use the Accused Products in an infringing manner, including through bridging USDC (USD Coin) between one blockchain network, such as Ethereum, and other blockchain networks, such as the Polygon network.    Ex. 25 (https://github.com/coinbase/coinbase-sdk-nodejs/blob/31b3dfe36db28ad712e21dd5421a247f4a532a51/quickstart-template/bridge-usdc.js). Coinbase provides these instructions and materials knowing and intending (or with willful blindness to the fact) that its customers and end users will commit these infringing acts.  Coinbase also continues to make, use, offer for sale, sell, and/or import the Accused Products, despite its knowledge of the '772 Patent, thereby specifically intending for and inducing its customers to infringe the '772 Patent through the customers' normal and customary use of the Accused Products.

53.    Coinbase has also infringed, and continues to infringe, one or more claims of the '772 Patent by selling, offering for sale, or importing into the United States, the Accused Products, knowing that the Accused Products constitute a material part of the inventions claimed in the '772 Patent, are especially made or adapted to infringe the '772 Patent, and are not staple articles or commodities of commerce suitable for non-infringing use.  At least as of the filing and service of this complaint, Coinbase has knowledge of the '772 Patent and the infringing nature of the Accused Products.  Coinbase has been, and currently is, contributorily infringing the '772 Patent in violation of 35 U.S.C. §§ 271(c) and/or (f).  For example, the identified hardware and/or software components and functionality in Coinbase's Wallet and Base applications utilizing the Cross-Chain Transfer Protocol (CCTP) constitute a material part of the inventions claimed in the '772 Patent, are especially made or adapted to infringe the '772 Patent, and are not staple

articles or commodities of commerce suitable for non-infringing use, as demonstrated by the evidence cited above and in Exhibit 23.

54. By making, using, offering for sale, selling and/or importing into the United States the Accused Products, Coinbase has injured Plaintiff and is liable for infringement of the '772 Patent pursuant to 35 U.S.C. § 271.

55. On information and belief, Plaintiff (including its predecessors and any licensees) complied with 35 U.S.C. § 287 during the relevant time period because Plaintiff, any predecessor assignees to the '772 Patent, and any licensees did not make, offer for sale, or sell products that practice(d) the '772 Patent during the relevant time period or were not required to mark during the relevant time period.

56. As a result of Coinbase's direct infringement of the '772 Patent, Plaintiff is entitled to monetary damages (past, present, and future) in an amount adequate to compensate for Coinbase's infringement, but in no event less than a reasonable royalty for the use made of the invention by Coinbase, together with interest and costs as fixed by the Court.

57. As a result of Coinbase's indirect infringement of the '772 Patent, Plaintiff is entitled to monetary damages (present and future) in an amount adequate to compensate for Coinbase's infringement, but in no event less than a reasonable royalty for the use made of the invention by Coinbase, together with interest and costs as fixed by the Court, accruing as of the time Coinbase obtained knowledge of the '772 Patent.

58. Plaintiff is also entitled to equitable and injunctive relief (with injunctive relief limited to the patent term).

## COUNT II

### INFRINGEMENT OF U.S. PATENT NO. 12,051,067

59.     Plaintiff realleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

60.     Plaintiff owns by assignment all rights, title, and interest, including the right to recover damages for past, present, and future infringement, in U.S. Patent No. 12,051,067, titled "Method and system for exchange of value or tokens between blockchain networks."  The '067 Patent was duly and legally issued by the United States Patent and Trademark Office on July 30, 2024.  A true and correct copy of the '067 Patent is attached as Exhibit 26.

61.     On information and belief, Coinbase has and continues to make, use, offer for sale, sell, and/or import certain products and services utilizing the Cross-Chain Transfer Protocol (CCTP), including without limitation Coinbase Wallet and Base applications ("Accused Products"), that directly infringe, literally and/or under the doctrine of equivalents, one or more claims of the '067 Patent.  Identification of the Accused Products will be provided in Plaintiff's infringement contentions disclosed pursuant to the Court's scheduling order.

62.     The Accused Products satisfy all claim limitations of one or more claims of the '067 Patent.  A claim chart comparing exemplary independent claim 1 of the '067 Patent to representative Accused Products is attached as Exhibit 27.  Upon information and belief, Coinbase performs the steps of the method on its own servers and/or on virtual private cloud servers provided by third parties.  Through the software code that Coinbase runs on its own or third-party servers, Coinbase conditions participation in, and receipt of the benefits of, the Coinbase services upon performance of the steps of claim 1 of the '067 Patent and establishes the manner and timing of that performance.

63.    Coinbase knowingly and intentionally induces infringement of one or more claims of the '067 Patent in violation of 35 U.S.C. § 271(b).  At least as of the filing and service of this complaint, Coinbase obtained knowledge of the '067 Patent and the infringing nature of the Accused Products.  Despite this knowledge of the '067 Patent, Coinbase continues to actively encourage and instruct its customers and end users (for example, through online instruction and other online publications cited in Exhibit 27) to use the Accused Products in ways that directly infringe the '067 Patent.  For example, Coinbase advertises that the Accused Products support the transfer of USD Coin (USDC) stablecoin to different blockchains.  Ex. 24 (https://help.coinbase.com/en/wallet/managing-account/usdc-coinbase-wallet).  Coinbase also instructs its customers and end users on how to configure and use the Accused Products in an infringing manner, including through bridging USDC (USD Coin) between one blockchain network, such as Ethereum, and other blockchain networks, such as the Polygon network.  Ex. 25 (https://github.com/coinbase/coinbase-sdk-nodejs/blob/31b3dfe36db28ad712e21dd5421a247f4a532a51/quickstart-template/bridge-usdc.js). Coinbase provides these instructions and materials knowing and intending (or with willful blindness to the fact) that its customers and end users will commit these infringing acts.  Coinbase also continues to make, use, offer for sale, sell, and/or import the Accused Products, despite its knowledge of the '067 Patent, thereby specifically intending for and inducing its customers to infringe the '067 Patent through the customers' normal and customary use of the Accused Products.

64.    Coinbase has also infringed, and continues to infringe, one or more claims of the '067 Patent by selling, offering for sale, or importing into the United States, the Accused Products, knowing that the Accused Products constitute a material part of the inventions claimed in

the '067 Patent, are especially made or adapted to infringe the '067 Patent, and are not staple articles or commodities of commerce suitable for non-infringing use. At least as of the filing and service of this complaint, Coinbase has knowledge of the '067 Patent and the infringing nature of the Accused Products. Coinbase has been, and currently is, contributorily infringing the '067 Patent in violation of 35 U.S.C. §§ 271(c) and/or (f). For example, the identified hardware and/or software components and functionality in Coinbase's Wallet and Base applications utilizing the Cross-Chain Transfer Protocol (CCTP) constitute a material part of the inventions claimed in the '067 Patent, are especially made or adapted to infringe the '067 Patent, and are not staple articles or commodities of commerce suitable for non-infringing use, as demonstrated by the evidence cited above and in Exhibit 27.

65.     By making, using, offering for sale, selling and/or importing into the United States the Accused Products, Coinbase has injured Plaintiff and is liable for infringement of the '067 Patent pursuant to 35 U.S.C. § 271.

66.     On information and belief, Plaintiff (including its predecessors and any licensees) complied with 35 U.S.C. § 287 during the relevant time period because Plaintiff, any predecessor assignees to the '067 Patent, and any licensees did not make, offer for sale, or sell products that practice(d) the '067 Patent during the relevant time period or were not required to mark during the relevant time period.

67.     As a result of Coinbase's direct infringement of the '067 Patent, Plaintiff is entitled to monetary damages (past, present, and future) in an amount adequate to compensate for Coinbase's infringement, but in no event less than a reasonable royalty for the use made of the invention by Coinbase, together with interest and costs as fixed by the Court.

68.     As a result of Coinbase's indirect infringement of the '067 Patent, Plaintiff is entitled to monetary damages (present and future) in an amount adequate to compensate for Coinbase's infringement, but in no event less than a reasonable royalty for the use made of the invention by Coinbase, together with interest and costs as fixed by the Court, accruing as of the time Coinbase obtained knowledge of the '067 Patent.

69.     Plaintiff is also entitled to equitable and injunctive relief (with injunctive relief limited to the patent term).

## COUNT III

## INFRINGEMENT OF U.S. PATENT NO. 10,394,845

70.     Plaintiff realleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

71.     Plaintiff owns by assignment all rights, title, and interest, including the right to recover damages for past, present, and future infringement, in U.S. Patent No. 10,394,845, titled "Method and system for tuning blockchain scalability for fast and low-cost payment and transaction processing." The '845 Patent was duly and legally issued by the United States Patent and Trademark Office on August 27, 2019. A true and correct copy of the '845 Patent is attached as Exhibit 28.

72.     On information and belief, Coinbase has and continues to make, use, offer for sale, sell, and/or import certain products and services that utilize the Base network, including without limitation Coinbase Wallet and Base applications ("Accused Products"), that directly infringe, literally and/or under the doctrine of equivalents, one or more claims of the '845 Patent. Identification of the Accused Products will be provided in Plaintiff's infringement contentions disclosed pursuant to the Court's scheduling order.

29

73.    The Accused Products satisfy all claim limitations of one or more claims of the '845 Patent. A claim chart comparing exemplary independent claim 1 of the '845 Patent to representative Accused Products is attached as Exhibit 29. Upon information and belief, Coinbase performs the steps of the method on its own servers and/or on virtual private cloud servers provided by third parties. Through the software code that Coinbase runs on its own or third-party servers, Coinbase conditions participation in, and receipt of the benefits of, the Coinbase services upon performance of the steps of claim 1 of the '845 Patent and establishes the manner and timing of that performance.

74.    Coinbase knowingly and intentionally induces infringement of one or more claims of the '845 Patent in violation of 35 U.S.C. § 271(b). At least as of the filing and service of this complaint, Coinbase obtained knowledge of the '845 Patent and the infringing nature of the Accused Products. Despite this knowledge of the '845 Patent, Coinbase continues to actively encourage and instruct its customers and end users (for example, through online instruction and other online publications cited in Exhibit 29) to use the Accused Products in ways that directly infringe the '845 Patent. For example, Coinbase advertises that the Accused Products are a Ethereum Layer 2 blockchain network that "utilizes an Optimistic Rollup" to offload computation from the Ethereum network and combine "off-chain transactions together in batches before sending them to Ethereum." Ex. 30 (https://www.coinbase.com/developer-platform/discover/protocol-guides/guide-to-base). Coinbase also instructs its customers and end users on how to move transactions from the L1 network to the L2 network and vice versa. *See, e.g.*, Ex. 31 (https://docs.base.org/get-started/base). Coinbase provides these instructions and materials knowing and intending (or with willful blindness to the fact) that its customers and end users will commit these infringing acts. Coinbase also continues to make, use, offer for sale, sell, and/or import the

Accused Products, despite its knowledge of the '845 Patent, thereby specifically intending for and inducing its customers to infringe the '845 Patent through the customers' normal and customary use of the Accused Products.

75.     Coinbase has also infringed, and continues to infringe, one or more claims of the '845 Patent by selling, offering for sale, or importing into the United States, the Accused Products, knowing that the Accused Products constitute a material part of the inventions claimed in the '845 Patent, are especially made or adapted to infringe the '845 Patent, and are not staple articles or commodities of commerce suitable for non-infringing use.  At least as of the filing and service of this complaint, Coinbase has knowledge of the '845 Patent and the infringing nature of the Accused Products.  Coinbase has been, and currently is, contributorily infringing the '845 Patent in violation of 35 U.S.C. §§ 271(c) and/or (f).  For example, the identified hardware and/or software components and functionality in Coinbase's Wallet and Base applications utilizing the Base network constitute a material part of the inventions claimed in the '845 Patent, are especially made or adapted to infringe the '845 Patent, and are not staple articles or commodities of commerce suitable for non-infringing use, as demonstrated by the evidence cited above and in Exhibit 29.

76.     By making, using, offering for sale, selling and/or importing into the United States the Accused Products, Coinbase has injured Plaintiff and is liable for infringement of the '845 Patent pursuant to 35 U.S.C. § 271.

77.     On information and belief, Plaintiff (including its predecessors and any licensees) complied with 35 U.S.C. § 287 during the relevant time period because Plaintiff, any predecessor assignees to the '845 Patent, and any licensees did not make, offer for sale, or sell products that

practice(d) the '845 Patent during the relevant time period or were not required to mark during the relevant time period.

78.     As a result of Coinbase's direct infringement of the '845 Patent, Plaintiff is entitled to monetary damages (past, present, and future) in an amount adequate to compensate for Coinbase's infringement, but in no event less than a reasonable royalty for the use made of the invention by Coinbase, together with interest and costs as fixed by the Court.

79.     As a result of Coinbase's indirect infringement of the '845 Patent, Plaintiff is entitled to monetary damages (present and future) in an amount adequate to compensate for Coinbase's infringement, but in no event less than a reasonable royalty for the use made of the invention by Coinbase, together with interest and costs as fixed by the Court, accruing as of the time Coinbase obtained knowledge of the '845 Patent.

80.     Plaintiff is also entitled to equitable and injunctive relief (with injunctive relief limited to the patent term).

**COUNT IV**

**INFRINGEMENT OF U.S. PATENT NO. 10,102,265**

81.     Plaintiff realleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

82.     Plaintiff owns by assignment all rights, title, and interest, including the right to recover damages for past, present, and future infringement, in U.S. Patent No. 10,102,265, titled "Method and system for tuning blockchain scalability for fast and low-cost payment and transaction processing." The '265 Patent was duly and legally issued by the United States Patent and Trademark Office on October 16, 2018. A true and correct copy of the '265 Patent is attached as Exhibit 32.

83.     On information and belief, Coinbase has and continues to make, use, offer for sale, sell, and/or import certain products and services that utilize the Base network, including without limitation Coinbase Wallet and Base applications ("Accused Products"), that directly infringe, literally and/or under the doctrine of equivalents, one or more claims of the '265 Patent.  Identification of the Accused Products will be provided in Plaintiff's infringement contentions disclosed pursuant to the Court's scheduling order.

84.     The Accused Products satisfy all claim limitations of one or more claims of the '265 Patent.  A claim chart comparing exemplary independent claim 1 of the '265 Patent to representative Accused Products is attached as Exhibit 33.  Upon information and belief, Coinbase performs the steps of the method on its own servers and/or on virtual private cloud servers provided by third parties.  Through the software code that Coinbase runs on its own or third-party servers, Coinbase conditions participation in, and receipt of the benefits of, the Coinbase services upon performance of the steps of claim 1 of the '265 Patent and establishes the manner and timing of that performance.

85.     Coinbase knowingly and intentionally induces infringement of one or more claims of the '265 Patent in violation of 35 U.S.C. § 271(b).  At least as of the filing and service of this complaint, Coinbase obtained knowledge of the '265 Patent and the infringing nature of the Accused Products.  Despite this knowledge of the '265 Patent, Coinbase continues to actively encourage and instruct its customers and end users (for example, through online instruction and other online publications cited in Exhibit 30) to use the Accused Products in ways that directly infringe the '265 Patent.  For example, Coinbase advertises that the Accused Products are a Ethereum Layer 2 blockchain network that "utilizes an Optimistic Rollup" to offload computation from the Ethereum network and combine "off-chain transactions together in batches before sending them

to Ethereum." Ex. 30 (https://www.coinbase.com/developer-platform/discover/protocol-guides/guide-to-base). Coinbase also instructs its customers and end users on how to move transactions from the L1 network to the L2 network and vice versa. *See, e.g.,* Ex. 31 (https://docs.base.org/get-started/base). Coinbase provides these instructions and materials knowing and intending (or with willful blindness to the fact) that its customers and end users will commit these infringing acts. Coinbase also continues to make, use, offer for sale, sell, and/or import the Accused Products, despite its knowledge of the '265 Patent, thereby specifically intending for and inducing its customers to infringe the '265 Patent through the customers' normal and customary use of the Accused Products.

86. Coinbase has also infringed, and continues to infringe, one or more claims of the '265 Patent by selling, offering for sale, or importing into the United States, the Accused Products, knowing that the Accused Products constitute a material part of the inventions claimed in the '265 Patent, are especially made or adapted to infringe the '265 Patent, and are not staple articles or commodities of commerce suitable for non-infringing use. At least as of the filing and service of this complaint, Coinbase has knowledge of the '265 Patent and the infringing nature of the Accused Products. Coinbase has been, and currently is, contributorily infringing the '265 Patent in violation of 35 U.S.C. §§ 271(c) and/or (f). For example, the identified hardware and/or software components and functionality in Coinbase's Wallet and Base applications utilizing the Base network constitute a material part of the inventions claimed in the '265 Patent, are especially made or adapted to infringe the '265 Patent, and are not staple articles or commodities of commerce suitable for non-infringing use, as demonstrated by the evidence cited above and in Exhibit 33.

87.     By making, using, offering for sale, selling and/or importing into the United States the Accused Products, Coinbase has injured Plaintiff and is liable for infringement of the '265 Patent pursuant to 35 U.S.C. § 271.

88.     On information and belief, Plaintiff (including its predecessors and any licensees) complied with 35 U.S.C. § 287 during the relevant time period because Plaintiff, any predecessor assignees to the '265 Patent, and any licensees did not make, offer for sale, or sell products that practice(d) the '265 Patent during the relevant time period or were not required to mark during the relevant time period.

89.     As a result of Coinbase's direct infringement of the '265 Patent, Plaintiff is entitled to monetary damages (past, present, and future) in an amount adequate to compensate for Coinbase's infringement, but in no event less than a reasonable royalty for the use made of the invention by Coinbase, together with interest and costs as fixed by the Court.

90.     As a result of Coinbase's indirect infringement of the '265 Patent, Plaintiff is entitled to monetary damages (present and future) in an amount adequate to compensate for Coinbase's infringement, but in no event less than a reasonable royalty for the use made of the invention by Coinbase, together with interest and costs as fixed by the Court, accruing as of the time Coinbase obtained knowledge of the '265 Patent.

91.     Plaintiff is also entitled to equitable and injunctive relief (with injunctive relief limited to the patent term).

## COUNT V

## INFRINGEMENT OF U.S. PATENT NO. 11,861,609

92.     Plaintiff realleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

93. Plaintiff owns by assignment all rights, title, and interest, including the right to recover damages for past, present, and future infringement, in U.S. Patent No. 11,861,609, titled "Method and system for exchange of value or tokens between blockchain networks." The '609 Patent was duly and legally issued by the United States Patent and Trademark Office on January 2, 2024. A true and correct copy of the '609 Patent is attached as Exhibit 34.

94. On information and belief, Coinbase has and continues to make, use, offer for sale, sell, and/or import certain products and services, including without limitation Coinbase's Verified Pools ("Accused Products"), that directly infringe, literally and/or under the doctrine of equivalents, one or more claims of the '609 Patent. Identification of the Accused Products will be provided in Plaintiff's infringement contentions disclosed pursuant to the Court's scheduling order.

95. The Accused Products satisfy all claim limitations of one or more claims of the '609 Patent. A claim chart comparing exemplary independent claim 1 of the '609 Patent to representative Accused Products is attached as Exhibit 35. Upon information and belief, Coinbase performs the steps of the method on its own servers and/or on virtual private cloud servers provided by third parties. Through the software code that Coinbase runs on its own or third-party servers, Coinbase conditions participation in, and receipt of the benefits of, the Coinbase services upon performance of the steps of claim 1 of the '609 Patent and establishes the manner and timing of that performance.

96. Coinbase obtained knowledge of the '609 Patent since at least February 22, 2022 through the Patent Office's Notice of Allowance identifying the application that issued as the '609 Patent as prior art to U.S. Patent App. No. 16/452,963, which issued to Coinbase as U.S. Patent No. 11,367,066 on June 21, 2022.

97.     Coinbase knowingly and intentionally induces infringement of one or more claims of the '609 Patent in violation of 35 U.S.C. § 271(b).  At least as of the filing and service of this complaint, Coinbase obtained knowledge of the '609 Patent and the infringing nature of the Accused Products.  Despite this knowledge of the '609 Patent, Coinbase continues to actively encourage and instruct its customers and end users (for example, through online instruction and other online publications cited in Exhibit 35) to use the Accused Products in ways that directly infringe the '609 Patent.  For example, Coinbase advertises that its Verified Pools 'leverages Uniswap v4 to enable its permissioned liquidity pools," which introduced "flash accounting" among other features.    Ex.  36  (https://www.coinbase.com/en-in/verified-pools);  Ex.  37  (https://docs.verifiedpools.com/developers/uniswap-v4).  Coinbase also instructs its customers and end users on how to perform transactions through Coinbase's Verified Pools. *See id.*; Ex. 36 (https://www.coinbase.com/en-in/verified-pools); Ex. 38 (https://docs.verifiedpools.com/access).  Coinbase provides these instructions and materials knowing and intending (or with willful blindness to the fact) that its customers and end users will commit these infringing acts.  Coinbase also continues to make, use, offer for sale, sell, and/or import the Accused Products, despite its knowledge of the '609 Patent, thereby specifically intending for and inducing its customers to infringe the '609 Patent through the customers' normal and customary use of the Accused Products.

98.     Coinbase has also infringed, and continues to infringe, one or more claims of the '609 Patent by selling, offering for sale, or importing into the United States, the Accused Products, knowing that the Accused Products constitute a material part of the inventions claimed in the '609 Patent, are especially made or adapted to infringe the '609 Patent, and are not staple articles or commodities of commerce suitable for non-infringing use.  At least as of the filing and service of this complaint, Coinbase has knowledge of the '609 Patent and the infringing nature of

the Accused Products.  Coinbase has been, and currently is, contributorily infringing the '609 Patent in violation of 35 U.S.C. §§ 271(c) and/or (f).  For example, the identified hardware and/or software components and functionality in Coinbase's Verified Pools constitute a material part of the inventions claimed in the '609 Patent, are especially made or adapted to infringe the '609 Patent, and are not staple articles or commodities of commerce suitable for non-infringing use, as demonstrated by the evidence cited above and in Exhibit 35.

99.     By making, using, offering for sale, selling and/or importing into the United States the Accused Products, Coinbase has injured Plaintiff and is liable for infringement of the '609 Patent pursuant to 35 U.S.C. § 271.

100.     On information and belief, Plaintiff (including its predecessors and any licensees) complied with 35 U.S.C. § 287 during the relevant time period because Plaintiff, any predecessor assignees to the '609 Patent, and any licensees did not make, offer for sale, or sell products that practice(d) the '609 Patent during the relevant time period or were not required to mark during the relevant time period.

101.     As a result of Coinbase's direct infringement of the '609 Patent, Plaintiff is entitled to monetary damages (past, present, and future) in an amount adequate to compensate for Coinbase's infringement, but in no event less than a reasonable royalty for the use made of the invention by Coinbase, together with interest and costs as fixed by the Court.

102.     As a result of Coinbase's indirect infringement of the '609 Patent, Plaintiff is entitled to monetary damages (present and future) in an amount adequate to compensate for Coinbase's infringement, but in no event less than a reasonable royalty for the use made of the invention by Coinbase, together with interest and costs as fixed by the Court, accruing as of the time Coinbase obtained knowledge of the '609 Patent.

103.    Plaintiff is also entitled to equitable and injunctive relief (with injunctive relief limited to the patent term).

## COUNT VI

## INFRINGEMENT OF U.S. PATENT NO. 11,915,237

104.    Plaintiff realleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

105.    Plaintiff owns by assignment all rights, title, and interest, including the right to recover damages for past, present, and future infringement, in U.S. Patent No. 11,915,237, titled "Methods and systems for smart contracts for security and filtering." The '237 Patent was duly and legally issued by the United States Patent and Trademark Office on February 27, 2024. A true and correct copy of the '237 Patent is attached as Exhibit 39.

106.    On information and belief, Coinbase has and continues to make, use, offer for sale, sell, and/or import certain products and services, including without limitation Coinbase's Scalable Blockchain Address Risk Scoring System ("Accused Products"), that directly infringe, literally and/or under the doctrine of equivalents, one or more claims of the '237 Patent. Identification of the Accused Products will be provided in Plaintiff's infringement contentions disclosed pursuant to the Court's scheduling order.

107.    The Accused Products satisfy all claim limitations of one or more claims of the '237 Patent. A claim chart comparing exemplary independent claim 1 of the '237 Patent to representative Accused Products is attached as Exhibit 40. Upon information and belief, Coinbase performs the steps of the method on its own servers and/or on virtual private cloud servers provided by third parties. Through the software code that Coinbase runs on its own or third-party servers, Coinbase conditions participation in, and receipt of the benefits of, the Coinbase services upon performance

of the steps of claim 1 of the '237 Patent and establishes the manner and timing of that performance.

108.   Coinbase knowingly and intentionally induces infringement of one or more claims of the '237 Patent in violation of 35 U.S.C. § 271(b).  At least as of the filing and service of this complaint, Coinbase obtained knowledge of the '237 Patent and the infringing nature of the Accused Products.  Despite this knowledge of the '237 Patent, Coinbase continues to actively encourage and instruct its customers and end users (for example, through online instruction and other online publications cited in Exhibit 40) to use the Accused Products in ways that directly infringe the '237 Patent.  For example, Coinbase advertises that its Scalable Blockchain Address Risk Scoring System uses "machine leaning to predict potential fraudulent transactions."   Ex. 41 (https://www.coinbase.com/blog/detecting-fraudulent-transactions-coinbase-scalable-blockchain-address-risk).  Coinbase also instructs its customers and end users on how to perform transactions that utilize Coinbase's Blockchain Address Risk Scoring System.   *See id.*; Ex. 42 (https://help.coinbase.com/en/coinbase/trading-and-funding/buying-selling-or-converting-crypto/how-do-i-buy-digital-currency).  Coinbase provides these instructions and materials knowing and intending (or with willful blindness to the fact) that its customers and end users will commit these infringing acts.  Coinbase also continues to make, use, offer for sale, sell, and/or import the Accused Products, despite its knowledge of the '237 Patent, thereby specifically intending for and inducing its customers to infringe the '237 Patent through the customers' normal and customary use of the Accused Products.

109.   Coinbase has also infringed, and continues to infringe, one or more claims of the '237 Patent by selling, offering for sale, or importing into the United States, the Accused Products, knowing that the Accused Products constitute a material part of the inventions claimed in

the '237 Patent, are especially made or adapted to infringe the '237 Patent, and are not staple articles or commodities of commerce suitable for non-infringing use. At least as of the filing and service of this complaint, Coinbase has knowledge of the '237 Patent and the infringing nature of the Accused Products. Coinbase has been, and currently is, contributorily infringing the '237 Patent in violation of 35 U.S.C. §§ 271(c) and/or (f). For example, the identified hardware and/or software components and functionality in Coinbase's Scalable Blockchain Address Risk Scoring System constitute a material part of the inventions claimed in the '237 Patent, are especially made or adapted to infringe the '237 Patent, and are not staple articles or commodities of commerce suitable for non-infringing use, as demonstrated by the evidence cited above and in Exhibit 40.

110. By making, using, offering for sale, selling and/or importing into the United States the Accused Products, Coinbase has injured Plaintiff and is liable for infringement of the '237 Patent pursuant to 35 U.S.C. § 271.

111. On information and belief, Plaintiff (including its predecessors and any licensees) complied with 35 U.S.C. § 287 during the relevant time period because Plaintiff, any predecessor assignees to the '237 Patent, and any licensees did not make, offer for sale, or sell products that practice(d) the '237 Patent during the relevant time period or were not required to mark during the relevant time period.

112. As a result of Coinbase's direct infringement of the '237 Patent, Plaintiff is entitled to monetary damages (past, present, and future) in an amount adequate to compensate for Coinbase's infringement, but in no event less than a reasonable royalty for the use made of the invention by Coinbase, together with interest and costs as fixed by the Court.

113. As a result of Coinbase's indirect infringement of the '237 Patent, Plaintiff is entitled to monetary damages (present and future) in an amount adequate to compensate for Coinbase's

41

infringement, but in no event less than a reasonable royalty for the use made of the invention by Coinbase, together with interest and costs as fixed by the Court, accruing as of the time Coinbase obtained knowledge of the '237 Patent.

114.    Plaintiff is also entitled to equitable and injunctive relief (with injunctive relief limited to the patent term).

**COUNT VII**

**INFRINGEMENT OF U.S. PATENT NO. 11,494,764**

115.    Plaintiff realleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

116.    Plaintiff owns by assignment all rights, title, and interest, including the right to recover damages for past, present, and future infringement, in U.S. Patent No. 11,494,764, titled "Methods and systems for smart contracts for security and filtering." The '764 Patent was duly and legally issued by the United States Patent and Trademark Office on November 8, 2022. A true and correct copy of the '764 Patent is attached as Exhibit 43.

117.    On information and belief, Coinbase has and continues to make, use, offer for sale, sell, and/or import certain products and services, including without limitation Coinbase's Scalable Blockchain Address Risk Scoring System ("Accused Products"), that directly infringe, literally and/or under the doctrine of equivalents, one or more claims of the '764 Patent. Identification of the Accused Products will be provided in Plaintiff's infringement contentions disclosed pursuant to the Court's scheduling order.

118.    The Accused Products satisfy all claim limitations of one or more claims of the '764 Patent. A claim chart comparing exemplary independent claim 1 of the '764 Patent to representative Accused Products is attached as Exhibit 44. Upon information and belief, Coinbase performs

42

the steps of the method on its own servers and/or on virtual private cloud servers provided by third parties. Through the software code that Coinbase runs on its own or third-party servers, Coinbase conditions participation in, and receipt of the benefits of, the Coinbase services upon performance of the steps of claim 1 of the '764 Patent and establishes the manner and timing of that performance.

119. Coinbase knowingly and intentionally induces infringement of one or more claims of the '764 Patent in violation of 35 U.S.C. § 271(b). At least as of the filing and service of this complaint, Coinbase obtained knowledge of the '764 Patent and the infringing nature of the Accused Products. Despite this knowledge of the '764 Patent, Coinbase continues to actively encourage and instruct its customers and end users (for example, through online instruction and other online publications cited in Exhibit 44) to use the Accused Products in ways that directly infringe the '764 Patent. For example, Coinbase advertises that its Scalable Blockchain Address Risk Scoring System uses "machine leaning to predict potential fraudulent transactions." Ex. 41 (https://www.coinbase.com/blog/detecting-fraudulent-transactions-coinbase-scalable-blockchain-address-risk). Coinbase also instructs its customers and end users on how to perform transactions that utilize Coinbase's Blockchain Address Risk Scoring System. *See id.*; Ex. 42 (https://help.coinbase.com/en/coinbase/trading-and-funding/buying-selling-or-converting-crypto/how-do-i-buy-digital-currency). Coinbase provides these instructions and materials knowing and intending (or with willful blindness to the fact) that its customers and end users will commit these infringing acts. Coinbase also continues to make, use, offer for sale, sell, and/or import the Accused Products, despite its knowledge of the '764 Patent, thereby specifically intending for and inducing its customers to infringe the '764 Patent through the customers' normal and customary use of the Accused Products.

43

120.    Coinbase has also infringed, and continues to infringe, one or more claims of the '764 Patent by selling, offering for sale, or importing into the United States, the Accused Products, knowing that the Accused Products constitute a material part of the inventions claimed in the '764 Patent, are especially made or adapted to infringe the '764 Patent, and are not staple articles or commodities of commerce suitable for non-infringing use. At least as of the filing and service of this complaint, Coinbase has knowledge of the '764 Patent and the infringing nature of the Accused Products. Coinbase has been, and currently is, contributorily infringing the '764 Patent in violation of 35 U.S.C. §§ 271(c) and/or (f). For example, the identified hardware and/or software components and functionality in Coinbase's Scalable Blockchain Address Risk Scoring System constitute a material part of the inventions claimed in the '764 Patent, are especially made or adapted to infringe the '764 Patent, and are not staple articles or commodities of commerce suitable for non-infringing use, as demonstrated by the evidence cited above and in Exhibit 44.

121.    By making, using, offering for sale, selling and/or importing into the United States the Accused Products, Coinbase has injured Plaintiff and is liable for infringement of the '764 Patent pursuant to 35 U.S.C. § 271.

122.    On information and belief, Plaintiff (including its predecessors and any licensees) complied with 35 U.S.C. § 287 during the relevant time period because Plaintiff, any predecessor assignees to the '764 Patent, and any licensees did not make, offer for sale, or sell products that practice(d) the '764 Patent during the relevant time period or were not required to mark during the relevant time period.

123.    As a result of Coinbase's direct infringement of the '764 Patent, Plaintiff is entitled to monetary damages (past, present, and future) in an amount adequate to compensate for

Coinbase's infringement, but in no event less than a reasonable royalty for the use made of the invention by Coinbase, together with interest and costs as fixed by the Court.

124.    As a result of Coinbase's indirect infringement of the '764 Patent, Plaintiff is entitled to monetary damages (present and future) in an amount adequate to compensate for Coinbase's infringement, but in no event less than a reasonable royalty for the use made of the invention by Coinbase, together with interest and costs as fixed by the Court, accruing as of the time Coinbase obtained knowledge of the '764 Patent.

125.    Plaintiff is also entitled to equitable and injunctive relief (with injunctive relief limited to the patent term).

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter:

a.    A judgment in favor of Plaintiff that Coinbase has infringed, either literally and/or under the doctrine of equivalents, the '772, '067, '845, '265, '609, '237, and '764 Patents;

b.    A judgment and order requiring Coinbase to pay Plaintiff its damages (past, present, and future), costs, expenses, and pre-judgment and post-judgment interest for Coinbase's infringement of the '772, '067, '845, '265, '609, '237, and '764 Patents;

c.    A judgment and order requiring Coinbase to pay Plaintiff compulsory ongoing licensing fees, as determined by the Court in equity.

d.    A judgment and order requiring Coinbase to provide an accounting and to pay supplemental damages to Plaintiff, including without limitation, pre-judgment and post-judgment interest and compensation for infringing products released after the filing of this case that are not colorably different from the accused products;

e.    A judgment pursuant to 35 U.S.C. § 283 permanently enjoining Coinbase and any

of its officers, directors, agents, servants, subsidiaries, affiliates, divisions, branches, parents, and/or those in association with them from further infringing the '772, '067, '845, '265, '609, '237, and '764 Patents during the duration of their patent terms;

f.    A judgment and order finding that this is an exceptional case within the meaning of 35 U.S.C. § 285 and awarding to Plaintiff its reasonable attorneys' fees against Coinbase; and

g.    Any and all other relief as the Court may deem appropriate and just under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiff, under Rule 38 of the Federal Rules of Civil Procedure, requests a trial by jury of any issues so triable by right.

Dated: May 7, 2026

Respectfully submitted,

*/s/ Christopher T. Bovenkamp*

STEVEN CALLAHAN
  Texas State Bar No. 24053122
  scallahan@ccrglaw.com
CHRISTOPHER T. BOVENKAMP
  Texas State Bar No. 24006877
  cbovenkamp@ccrglaw.com
**CHARHON CALLAHAN
ROBSON & GARZA, PLLC**
3333 Lee Parkway, Suite 460
Dallas, Texas 75219
Telephone: (214) 521-6400
Telecopier: (214) 764-8392

Brett E. Cooper (NY SBN 4011011)
  bcooper@bclgpc.com
Seth Hasenour (TX SBN 24059910)
  shasenour@bclgpc.com
Jonathan Yim (TX SBN 24066317)
  jyim@bclgpc.com
Drew B. Hollander (NY SBN 5378096)
  dhollander@bclgpc.com
**BC LAW GROUP, P.C.**
200 Madison Avenue, 24th Floor
New York, NY 10016
Phone: 212-951-0100

*Counsel for Plaintiff VM Innovations I, LLC*

47